AARON STRETCH, EX'R., & others *vs.* THOMAS MCCAMPBELL
& others.

## October Term, 1872.

EXECUTOR, LIABILITY OF FOR PROPERTY ORDERED BY THE WILL TO BE CON-
VERTED.—An executor, who acts in good faith, and for reasonable cause, in
delaying to make a conversion of property ordered by the will, is not liable for
any loss occasioned by the delay.

LEGATEE, INTEREST OF IN UNCONVERTED PROPERTY.—Legatees of the pro-
ceeds of land ordered to be sold are entitled to an interest in the property, so
long as it remains unsold, corresponding to their interest in the proceeds when
converted, and, of course, to their shares of the rents, issues, and profits, and
the burden of proof is on them to show loss by the delay in the conversion.

PRACTICE—DECREE FOR AN ACCOUNT.—Particular directions given for a de-
cree for an account between executor and legatees, embracing the usual ad-
ministration account, an account for rents, an account for property sold, and
an account for payments to legatees.

*Thos. H. Malone,* for complainant.

*Thos. N. Frazier,* for defendants.

*E. H. East,* for infants.

BILL and cross-bill.

THE CHANCELLOR:—In the latter part of June, 1863,
Thomas Gowdey, long a resident citizen of Davidson county,
Tenn., departed this life in said county, having first made
his last will and testament, which was duly proved and re-
corded after his death, and the complainant, Aaron Stretch,
qualified as executor thereof. The testator left him surviv-
ing his widow, Ann Gowdey, and six children, to-wit:—
Fanny Stretch, wife of Aaron Stretch, Ellen Stewart, Anna
McCampbell, wife of Thomas McCampbell, Addie Cox, wife
of Thomas Cox, Wm. H. Gowdey and James Gowdey, the
youngest of whom came of age on the 7th of January, 1864.
By his will, in the events which had happened after its exe-
cution, and as construed by this court in this case at the
April term, 1869, the testator in effect gave his widow con-
trol of his estate until the youngest child came of age, and
then directs his executors to sell all his estate, real, personal
and mixed, except only so much "as will yield a yearly net
income of $1,000 per annum, payable quarterly" to his

widow during her natural life, the amount thus realized to be equally divided among his children share and share alike. The will further provides that the part of his estate reserved to raise the annuity for his wife should also be sold at her death and the amount of such sale equally divided between his children share and share alike. It further provides that the shares of his daughters shall be invested in productive real estate or mortgages to their sole and separate use, and after their deaths to go to their lawful issue, share and share alike, with power in the daughters, in case any of them died without leaving lawful issue, to give her or their proportion of his estate to whom they might think proper by any instrument of writing purporting to be her last will and testament. The testator left a considerable personal estate, a business house and lot on College street, and about six acres of land in what is known as the Vauxhall addition to Nashville. On the 9th of February, 1864, Aaron Stretch filed his bill in this court against the widow and children of the testator, and the husbands of the daughters, for a construction of the will, and submitting whether, in the then situation of the country, war being flagrant, he should "proceed immediately to sell the real estate aforesaid and what disposition should be made of the proceeds in the event of a sale, and what disposition should be made of the balance of the estate, money," etc.

Process under this bill was served upon the defendant, Anna McCampbell, on the 11th of March, 1864, and on Thomas McCampbell on the 14th of June, 1864.

In March, 1865, an amended and supplemental bill was filed, in which the executor, his wife, the testator's widow, and all the testator's other children and the husbands of the married women are made complainants, except Anna Mc-Campbell, and Thomas McCampbell, her husband, and Thomas Cox who are made defendants. Two children of Ellen A. Stewart, and five children of Aaron Stretch and Fannie, his wife, are also made complainants, being stated to be infants who appear by Aaron Stretch, their next

friend. This bill states that Stretch and wife, with their children, have removed to Pennsylvania, and that the other complainants contemplate removing in a short time to that state, and suggest that it would be manifestly to the interest of the married women and infants to sell the testator's real estate, and allow the proceeds to be removed to Pennsylvania. The two sons of the testator ask that their interest in the estate be set apart to them, and for this purpose, that the land be sold if necessary. The testator's widow consents to a sale, provided her annuity is not left less secure.

Both in the original and amended bill, the executor asks to be permitted to resign the trusts he may have taken on himself, by virtue of his qualifying as executor, so far as Anna McCampbell is concerned.

Process on this amended and supplemental bill was served upon Thomas McCampbell and Anna, his wife, on the 23d of March, 1865. The children of Anna McCampbell seem to have been subsequently made defendants, probably by order of court, and process was served upon them on the 16th of April, 1866. Two of these children, who seem to have come of age, file an answer in proper person, but when nowhere appears. The other children answer by guardian *ad litem,* which answer is sworn to 20th of June, 1870. Neither of these last answers are marked as filed. Thomas McCampbell and Anna, his wife, seem to have filed a brief answer, on the 4th of June, 1867, in which they say they "are willing that the will be executed, and that complainant be compelled to account as executor." This answer seems to be only to the original bill. On the 13th of July, 1869, they filed a full and complete answer to both bills, in which they distinctly insist that the power of sale of the real estate was given to three persons as executors, only one of whom qualified as such, and submit, moreover, whether such executor, after having filed a bill for a construction of the will and instructions as to his duty under the same, can proceed to sell the real estate without an order of court. They further insist that the direction of the will to sell real

estate was a conversion out and out, "and that the daughters have an absolute estate and not the interest or use for life." And they ask that the lands be sold or divided under the orders and decrees of the court. They attack the sale of the store-house on College street as improvident and for less than its value. Upon this state of the pleadings, and without any proof, the cause was heard in July, 1869, and a decree rendered construing the will, and holding that the sale of the College street property was within the discretionary power of the trustee, and, in the absence of proof showing an improper exercise of discretion, was valid. But leave was given to the defendants to file a cross-bill by the next term. A general account of the administration was ordered. On the 4th of October, 1869, Thomas McCampbell and Anna, his wife, filed their cross-bill, alleging that the executor neglected to sell the real estate at the time he ought to have sold it, namely, at the expiration of one year from the death of the testator, and when real estate of similar character was bringing a high price ; and attacking the sale of the College street property because the price was inadequate, and because the sale was improvident, that being the only property from which the widow's annuity could be raised. This property was sold early in the year 1868 for $25,000. The cross-bill was answered at length by the executor, explaining why the real estate was not sold within a reasonable time after the testator's death, by the fact that war was then prevailing ; that the parties interested desired that no sale should be made ; that the bill was filed for a construction of the will, and doubts existed as to the proper construction ; that the complainants in the cross-bill were parties to the suit, and could have hastened a sale if they had seen proper: The answer also insists that the sale of the College street property was for a full and fair price, and made with the assent of all the children of testator.

No evidence has been introduced by the complainants in the cross-bill, who rely in argument upon the facts as developed by the pleadings to sustain their positions. And the

only evidence introduced by the executor is a formal deed, of the 24th of January, 1868, of the College street property, to the purchaser of that property, executed by the testator's widow, executor and children, the said Anna McCampbell being one of the bargainors, whose acknowledgement and privy examination seem to have been taken by the proper officer. But neither her husband nor the husband of Addie Cox joined in this deed. This instrument, it is stated by the answer, was intended to be delivered to the purchaser under the sale in controversy as evidence of title, but he, under the advice of counsel, declined to accept the same, and took title from the executor alone, but for the same consideration.

In reference to the sale of this property, sought to be impeached by the cross-bill, it is, perhaps, sufficient to say that the court by its decree of July, 1869, has determined that it was within the power of the executor under the will and valid, unless it could be shown affirmatively, by those seeking to impeach the sale, that it was made under such circumstances as to satisfy the court that the executor had been guilty of abusing his discretion to the detriment of the estate. This was not shown on the former hearing, but time was given to the parties seeking to impeach the sale, to file a cross-bill, and show, if they could, proof to that effect. They have again failed to introduce any evidence, and I am not able to see from the facts admitted in the answer to the cross-bill, that there was any wrongful exercise of the power of sale conferred upon the executor by the will, or any detriment to the estate by the sale. It has been frankly conceded by the able counsel for the executor that the deed of the 24th of January, 1864, is not admissible to show a divestiture of Mrs. McCampbell's title, her husband not having joined in the execution thereof, nor as an estoppel upon her to set up her rights. But it is insisted by him, and with reason, that it is certainly persuasive evidence of her knowledge and assent to the sale so far as to throw the burden of proof upon her to show an improper exercise of dis-

cretion by the executor; or, at any rate, it is persuasive
that the executor acted with the knowledge of all parties,
and with good intentions, and will be sufficient, in the absence
of anything in the evidence or the circumstances to the con-
trary, to sustain the good faith and validity of the act.

This conclusion is greatly strengthened by the fact that all
the other children of the testator acquiesce in what has been
done, and the guardian *ad litem* of the infant remainder-men
of the one-sixth share in controversy is silent on the subject.
I think, therefore, that the complainants in the cross-bill
have failed to make out their case on this point.

But the main object of the cross-bill, and the one most
pressed in argument by the learned counsel for these com-
plainants, is to hold the executor liable for a failure to con-
vert the realty at the expiration of one year from the
testator's death, and this by charging him with interest on
what the land would then have brought; and this also,
whether the legatee, Anna McCampbell, consented to the
delay in the conversion or not, she being a married woman,
and incapable of assenting. The learned counsel refers to
Jarman on Wills, 488–9, and Hill on Trustees, 370–382.
But I do not understand that these authorities, or the law,
go to that extent. It is certainly true, as contended for by
the learned counsel in another part of his brief, that his
clients, until the actual conversion of the property, take an
interest in the unconverted property, corresponding to that
which they would have been entitled to in the proceeds, if
the conversion had actually taken place. That is to say,
they would be entitled to the annual rents, issues and profits
until the conversion is made. And this, I presume, would
be conceded by the counsel on the other side. But I do not
understand that a trustee who acts in good faith in delaying
to make a conversion of property, will be liable for interest
as if a conversion had been made, or even for a loss on the
principal. He is undoubtedly liable for positive breach of
trust, and will not be excused by the assent of the *cestui que*
trust to such breach, if a married woman. But mere delay

is not a positive breach of trust, nor is it necessarily a breach of trust at all, under all circumstances. On the contrary, Mr. Hill, in his able treatise at the place cited by the learned counsel, page 380, after laying down the general rule as to the duty of the trustee to make conversions at the time required, expressly says: "But in these cases much must necessarily be left to the discretion of the trustees; and if in the honest and proper exercise of that discretion, they delay the realization—or conversion—they may not be held liable for any loss occasioned by that delay. As where executors who were directed by the will to call in the testator's personal estate, with all convenient speed, continued his trade for some years after his death, and thus occasioned a considerable loss, the court refused to charge them with the loss, as they acted *bona fide*, and according to the best of their judgment," citing 6 Sim. 504. And after citing other cases, the author adds: "And it is immaterial that the direction is to convert with all *convenient speed*, for that is no more than the ordinary duty implied in the office of trustee."

Whether mere delay, without any reason whatever, would be a breach of trust, it is not necessary to decide in this case. Here, the delay is sufficiently accounted for by the existence of civil war at the death of the testator, and for nearly two years thereafter; by the uncertainty of the currency after the conclusion of the war; by the pending of the litigation for a construction of the testator's will; by the consent of the parties interested, including the parties now insisting upon laches; and by the fact that these very parties in their sworn answer filed as late as July 13th, 1869, were objecting to the power of the executor to sell, all of which facts either appear of record, or will be judicially noticed by the court. A stronger case for delay it would be difficult to conceive of. And no proof has been introduced by the complainants to show that the delay was unadvised, against their wishes, or *mala fide*. Moreover, if the delay had been without excuse, I understand the law to be that the trustee will only be liable for the actual damage sustained. If an execu-

tor has delayed to collect a debt, it should appear that the debt could have been collected, and was lost by the delay. If the interest is regularly collected, and the debt finally realized, there is no cause of complaint. So if the trust property be realty, and it still remains in *statu quo*, and there is no proof to show that it is not worth as much now as at any previous period, or that the rents and profits have not been received, there is no ground for complaint. There is no proof in this case, and, so far as I can see, the trust estate, and the *cestui que* trust have not been damaged in the least. It was incumbent upon the parties who sought to charge the executor personally, to make out their case by proof. The court cannot supply its absence by intendment. And if it were left to conjecture, the acquiescence of all the other parties in interest in the course pursued, and the circumstances set out in the pleadings, would be very persuasive that the delay had been to the interest instead of the detriment of the parties. But the duty of the court is simply passive, and to decline to charge a trustee merely on the ground of delay in making a conversion, where such delay is fairly accounted for by the circumstances.

By the decree of July, 1869, it was referred to the clerk and master to take and state an account with the executor, and make report. Upon the coming in of his report, it was conceded to be essentially defective, and a new reference was made, the parties themselves agreeing upon the terms thereof. The report now again submitted is also conceded to be defective, and the matter must be again referred. I do not feel at liberty to change the terms of the decretal order heretofore made by the parties. It is, perhaps, unnecessarily minute in its directions, so far as it seems to contemplate and require separate statements of the matters of account under each of the several heads of reference; but it is the duty of the clerk to conform to it, unless the parties voluntarily waive its requirements. It seems to me sufficient to take the following separate accounts:

First : An ordinary administration account of the personal assets of the estate, in which the executor will be charged with all such sums as came, or might by reasonable diligence have come to his hands, and allowed all just credits, including reasonable compensation for his services. Upon such an account, it is not usual to charge interest for the two years allowed by law to wind up the estate, unless the executor is shown to have used the funds, or made interest. In this case, under the provisions of the will, the two years ought to be counted from the arrival at age of the youngest child, or say 1st January, 1864. The *corpus* of the fund at the expiration of the two years should be divided into six parts, and carried to the separate accounts with each legatee as hereinafter provided. Any assets of the personal estate which were realized by the executor after the expiration of the two years, should be brought into this account by charging the executor with the amounts thus received at the time received, and after deducting compensation and any other proper charges thereon, divided into six equal parts, and carried as of that date, or within a reasonable time thereafter, not exceeding sixty days, to the separate accounts with the several legatees.

Second : An account of the realty converted, in which the executor should be charged with the proceeds of realty sold, and allowed just credits and charges thereon, including reasonable compensation ; and the *corpus* thus ascertained should be divided into six equal parts and carried to the account with the several legatees, at the dates when such proceeds of sale begin to bear interest. If any expenses or loss accrue in subsequently collecting these proceeds, the same, unless chargeable to the executor by reason of some default on his part occasioning the loss, should be borne equally by each of the shares of the legatees. The net proceeds of the personalty and realty as thus ascertained, will, with the unconverted realty, constitute the *corpus* of the estate which must not be trenched upon, so far as the shares of the married women are concerned, and which, as to such

4

shares, should, under the will and the former decree, be invested in productive real estate or mortgages.

Third : There should then be an account of the rents and profits of the realty, in which the executor should be charged with all such rents and profits annually as came, or might by reasonable diligence have come to his hands, and allowed all just credits, including the payments made by him to the widow in satisfaction of her annuity, and reasonable compensation for his services. In this account, the executor will not be charged with the rent of the homestead deeded by the children to their mother, unless it appears that such rent was, by the agreement of the parties, to be deducted from the amount of the annuity under the will. The balances found for or against the executor *at the end of each year* on this account, should be divided into six equal parts, and carried to the separate account of the legatees. No interest will be calculated on the items of this account.

Fourth : There should be separate annual accounts with each legatee, in which the executor, as trustee, should be charged with the shares of each legatee in the personal estate, in the proceeds of the realty, and in the rents and profits of the realty at the respective dates when such shares are directed to be carried into these accounts as above, *with interest from these dates* calculated to the 1st day of January next ensuing, and credited with all payments made to such legatee, with like interest from the date of such payments, to the 1st day of January next ensuing. These accounts should be balanced on the 1st day of January of each year, and the balance, be it the one way or the other, carried into the account for the ensuing year, and interest calculated thereon.

When the final balances on these accounts are reached, the clerk must ascertain and report whether the payments made by the executor to any, and which of the married women, exceed the rents, issues and profits of realty, and the interest of the *corpus* of the personalty and proceeds of the realty, to which such legatee is entitled and how much ; in other

words, to what extent the *corpus* of such share has been trenched upon. The executor and the legatee for life will be jointly and severally chargeable with such excess to the infant parties entitled in remainder to said share. But the executor will be permitted to reimburse himself, under the circumstances, out of other rents, issues and profits of land and interest due, or to become due on such share, and to be subrogated to the right of the infants as against the tenant for life for so much of said excess as he may be compelled to pay to make good the *corpus* of such share.

The clerk will ascertain and report in what form the *corpus* of each share now is, and in doing this he will consider the two-thirds of the proceeds of the sale of the College street property as being invested in mortgage as provided by the will.

The parties may have such further orders or decrees for the sale of property, investment of funds, or other matters, as they may be entitled to.